## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
### Bid Protest

| | |
|---|---|
| SCALE AI, INC., | ) |
| | ) |
| Plaintiff, | ) No. _____ |
| | ) |
| v. | ) Judge _____ |
| | ) |
| THE UNITED STATES, | ) ██████████████████ |
| | ) |
| Defendant. | ) <span style="color:red">REDACTED VERSION</span> |
| | ) |

### COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Scale AI, Inc. ("Scale"), through undersigned counsel, files this post-award bid protest Complaint against Defendant, the United States of America, acting through the National Geospatial-Intelligence Agency ("NGA") challenging award of a contract to Enabled Intelligence, Inc. ("EI") under Request for Proposals No. HM047624R0005 ("RFP"), for NGA's "Sequoia" procurement.  In support of this action, Scale states as follows:

### I.    NATURE OF THE ACTION

1.    By way of Sequoia, NGA seeks a contractor to conduct "data labeling activities in support of [geospatial intelligence ("GEOINT") artificial intelligence/machine learning ("AI/ML")] capabilities across multiple programs and directorates within the NGA enterprise, the National System for Geospatial Intelligence (NSG), and the Department of Defense."  Ex. 1, PWS at 3.  The RFP anticipates the award of a seven-year, indefinite-delivery, indefinite-quantity ("IDIQ") contract with a $708 million ceiling, to deliver millions of geospatial data annotations annually.[1]  Ex. 2, RFP at 2.  The RFP further anticipates the award of an initial task

---

[1]    "Data annotation," or "data labeling," is the process of using specialized software and human review to identify and annotate "objects of interest" (*i.e.* foreign military ground vehicles,

order in "direct support to the NGA Maven Office." *Id.* at 62.  The NGA Maven Office is the successor program to Project Maven, the Department of Defense's flagship AI effort launched in 2017.  Sequoia's initial task order's data annotation services will specifically support the NGA Maven Office's AI training, test, and evaluation programs.

2.      Scale is the incumbent contractor for these services, having provided them to NGA and the predecessor Project Maven since September 29, 2020.  Originally a research and development effort, Scale's prior work within Project Maven investigated and established foundational approaches to the creation of high-quality labeled geospatial datasets for defense AI applications that are successfully used across DoD AI programs today.  More broadly, Scale's work serves as a cornerstone of America's AI infrastructure.  In partnership with leading AI labs, Fortune 500 companies, and the U.S. Government, Scale has produced over *15 billion* data annotations for cutting-edge AI computer vision programs.  And Scale's dedicated national security AI Center in St. Louis, Missouri, has delivered over *100 million* geospatial data annotations specifically to U.S. Government military and intelligence agencies—an unmatched track record in support of the nation's sensitive AI initiatives.

3.      The competition for the new Sequoia contract began in September 2024.  On September 25, 2025, NGA announced it had awarded the Sequoia procurement to EI.  This result was surprising; EI has minimal experience and *less than $1 million total* in prior government prime contract awards.

4.      ████████████████████████████████████████████

████████████████████████████████████████████

---

aircraft, and naval vessels) in satellite imagery for training and testing AI "computer vision" object detection models that automate and enhance geospatial intelligence analysis.

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████

██████████████████████

5.      As explained in more detail below, NGA's evaluation process and ratings were

riddled with errors.  In short, NGA

    i.     applied unstated evaluation criteria;
    ii.    was internally inconsistent in its proposal evaluations;
    iii.   applied the wrong evaluation criteria;
    iv.   failed to credit many of Scale's incumbent advantages;
    v.    gave an indefensible rating of "Substantial Confidence" in EI's past performance;
    vi.   failed to investigate EI's apparent conflict of interest; and
    vii.  failed to conduct a price realism analysis despite EI's price being roughly 15% lower than Scale's, and despite EI having next to no experience with the cloud infrastructure costs that NGA is aware of from the incumbent contract.

6.      ████████████████████████████████████████

█████████████████████████

7.      █████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

3

█████████████████████████████████████████

    ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

8.      NGA filed its override justification at GAO on January 16, 2026.  NGA's justification states the override was necessitated by the government shutdown that began on October 1, 2025.  At that time, NGA made an "initial determination that there was sufficient backlog from the incumbent contract that necessary support would be available through" October 30, 2025, such that there "would be little to no impact to continued operations if the lapse was resolved as expediently as prior lapses had been historically resolved."

9.      According to the justification, the shutdown's actual length—42 days, which NGA characterized as "an unprecedented duration"—"drastically altered NGA's internal considerations."  For that reason, on December 3, 2025—three weeks after the shutdown ended on November 12, 2025, and in the middle of NGA's debriefing of Scale—NGA issued Task Order 1 to EI "to allow for the on-boarding of the awardee and to begin accreditation processes of their software tools on NGA's network, which is a necessary step to begin performance of time-sensitive national security priorities.  And the override, in turn, was necessary to "continue to obtain data labeling services," without which "[NGA] and warfighters worldwide would necessary experience significant adverse consequences."

10.     The importance of the data labeling services at issue is inarguable.  But the circumstances necessitating the issuance of a task order to EI prior to completion of Scale's debriefing—specifically, NGA's concern about an "impact to continued operations" resulting from the length of the shutdown—were entirely of NGA's making.

11.     ██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

12. ████████████████████████████████

████████████████████████████████████

████████████████████████████

13. ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████████

████████████████████████████████████

██████████████████████████████████

████████████████

14. ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████

████████████

15. ████████████████████████████████

████████████████████████████████ and the parties have reached an agreement

regarding NGA's continued use of SEQUOIA during the pendency of this bid protest.  Scale will

not seek a temporary restraining order or preliminary injunctive relief based upon the Government's representation that, so long as this protest can be fully adjudicated by July 31, 2026, (1) EI's performance during the pendency of the protest will be limited to the task order already awarded at its current capacity; and (2) the Government will not use EI's ongoing performance as a basis to argue against the issuance of a permanent injunction. The parties will be prepared to discuss a schedule for proceedings during the Initial Status Conference.

## II.    JURISDICTION

16.    The Court has jurisdiction over this post-award bid protest action "objecting to . . . the award of a contract . . . in connection with a procurement" pursuant to 28 U.S.C. § 1491(b).

17.    Scale is an interested party to pursue this protest. To qualify as interested party, a protester must demonstrate that it is "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *Nat'l Air Cargo Grp., Inc. v. United States,* 126 Fed. Cl. 281, 295 (2016) (quoting *Am. Fed'n of Gov't Emps. v. United States,* 258 F.3d 1294, 1302 (Fed. Cir. 2001)); *see also CACI, Inc.-Fed. v. United States*, 67 F.4th 1145, 1151 (Fed. Cir. 2023) (affirming two-part, "actual or prospective offeror" with a "direct economic interest" test for interested party standing).

18.    Here, Scale was an actual offeror that submitted a proposal in response to the RFP. Scale's economic interest in the award is directly affected by NGA's unlawful actions discussed herein. Scale, therefore, is an interested party with standing to pursue this action.

### III.    THE PARTIES

19.     Scale is a leading AI data annotation company, providing data labeling, model evaluation, and software solutions to a range of commercial and government customers, including the Department of Defense.

20.     Defendant is the United States of America, acting by and through the National Geospatial-Intelligence Agency, an executive agency of the federal government.

### IV.    FACTUAL BACKGROUND

#### *The Sequoia Solicitation*

21.     On September 23, 2024, NGA issued the Sequoia RFP, seeking a contractor to create "labeled geospatial data using as-a-service delivery model." Ex. 2, RFP at 2.[2]  The work to be performed will build on NGA's successful Maven program, which has applied Artificial Intelligence/Machine Learning ("AI/ML") capabilities "to Intelligence Surveillance, and Reconnaissance (ISR) sensors and platforms, primarily through the acquisition or development of Computer Vision (CV) algorithms capable of performing a number of automated tasks including but not limited to object detection, object tracking, object classification, and pattern detection." Ex. 1, PWS at 3-4.

22.     By way of this procurement, NGA also sought to include data labeling activities "across multiple programs and directorates within the NGA enterprise, the National System for Geospatial Intelligence (NSG), and the Department of Defense" to "enable the continuous improvement of AI/ML model development" and "make every effort to fully take advantage of emerging technologies and approaches" in the areas of (1) label dataset creation; (2) label dataset

---

[2]     NGA issued five amendments to the RFP.  Relevant here, Amendment 3 made some revisions to Section L but unless otherwise indicated all citations herein are to the initial fully conformed RFP.

quality; (3) data labeling platform and storage utilizing as-a-service delivery model; and (4) label efficiencies. *Id*.

23.    The to-be-awarded contract will have a performance period consisting of a three-year base ordering period and one four-year optional ordering period, with a maximum value of $708 million.  Ex. 2, RFP at 2.

### *The Evaluation Framework*

24.    The RFP contemplated a best value trade-off award decision considering six evaluation factors: Factor 1, Technical Demonstration; Factor 2, Technical/Management Approach; Factor 3, Past Performance; Factor 4, Security; Factor 5, Intellectual Property; and Factor 6, Price.  *Id.* at 64.  The evaluation factors were weighted as follows: Technical Demonstration (Factor 1) and Technical/Management Approach (Factor 2) were of equal importance, and each individually more important than Past Performance (Factor 3) and Intellectual Property (Factor 5), which were of equal importance.  *Id.*  Security (Factor 4) was evaluated Pass/Fail.  *Id.*  The rated non-price factors (not including Factor 4), when combined, were significantly more important than the Price Factor.  *Id.*

25.    The RFP instructed that NGA would evaluate offeror proposals using a two-phase, advisory down-select process.  *Id.* at 48.  In Phase 1, to gauge offerors' technical capabilities under Factor 1, Technical Demonstration, in lieu of written proposals, the RFP called for each offeror to provide a 45-minute oral presentation to NGA's technical evaluation team. *Id.* at 50-52.  Based on the Phase 1 oral presentations, NGA would assign each offeror a Factor 1 rating and make an advisory down-select decision, after which offerors electing to continue onto Phase 2 were required to submit a written proposal addressing the remaining evaluation factors

including, as relevant here, Factor 2, Technical/ Management Approach, Factor 3, Past Performance, and Factor 6, Price. *Id.* at 48.

26.     During the Phase 1 technical demonstration, each offeror had to "provide a demonstration of its proposed labeling platform and process in creating labels; and its quality control process." The demonstrations were to address three Factor 1 subfactors (listed in descending order of importance): Subfactor 1.1 – Quality Control; Subfactor 1.2 – Label Creation; and Subfactor 1.3 – Labeling Platform. *Id.* at 52.

27.     Under Subfactor 1.1 – Quality Control, oral presentations were to demonstrate offerors':

- Review Process;
- How to identify issues;
- How to correct issues;
- Ways to monitor performance;
- How to quantitatively measure quality; and
- Ways to trigger re-training of labelers.

*Id.* at 50.

28.     The RFP specified that "[i]f selected for contract award, the offeror shall incorporate the Quality Control contents from its presentation for this subfactor [1.1] into the contractor's quality control plan." *Id.*

29.     Factor 2, Technical/Management Approach contained six subfactors, listed in descending order of importance: Subfactor 2.1 – Performance Metrics; Subfactor 2.2 – Labeling Guidance; Subfactor 2.3 – Betterments; Subfactor 2.4 – Labeling Workforce Structure; Subfactor 2.5 – Classified Network Access; and Subfactor 2.6 – Small Business Participation Plan. *Id.* at 56, 64. The RFP provided that the Performance Metrics proposed under Subfactor 2.1, would "be incorporated into the resulting contract" (along with the Quality Control approaches presented under Subfactor 1.1). *Id.* at 56.

30.    The RFP imposed strict page limits for the Factor 2 Subfactor responses.  Offerors had just five pages each for Subfactors 2.1 through 2.3; and just two pages each for subfactors 2.4 and 2.5.

31.    In assessing Factor 2 Subfactors 2.1 through 2.5, NGA was to utilize the following adjectival ratings, each of which contained both "technical" and "risk" components:

- <u>Outstanding</u> – Proposal indicates an exceptional approach and understanding of the requirements and contains multiple strengths, and risk of unsuccessful performance is low.

- <u>Good</u> – Proposal indicates a thorough approach and understanding of the requirements and contains at least one strength, and risk of unsuccessful performance is low to moderate.

- <u>Acceptable</u> – Proposal meets requirements and indicates an adequate approach and understanding of the requirements, and risk of unsuccessful performance is no worse than moderate.

- <u>Marginal</u> – Proposal has not demonstrated an adequate approach and understanding of the requirements, and/or risk of unsuccessful performance is high.

- <u>Unacceptable</u> – Proposal does not meet requirements of the solicitation, and thus, contains one or more deficiencies, and/or risk of unsuccessful performance is unacceptable. Proposal is unawardable.

*Id.* at 66-67.

32.    The RFP provided technical risk descriptions for the terms "Low," "Moderate," "High," and "Unacceptable."  *Id.* at 67.  Relevant here, the RFP defined "Unacceptable" to mean a proposal contained "a deficiency or a combination of significant weaknesses that causes an unacceptable level of risk of unsuccessful performance."  *Id.*

33.    The RFP also provided a table containing "degrees of strengths and weaknesses," which provided the following range:

- <u>Significant Strength</u> – An aspect of an Offeror's proposal that has merit or exceeds specified performance or capability requirements in a way that will be significantly advantageous to the Government during contract performance (or may significantly decrease the risk of unsuccessful contract performance).

- <u>Moderate Strength</u> – An aspect of an Offeror's proposal that has merit or exceeds specified performance or capability requirements in a way that will be moderately advantageous to the Government during contract performance (and/or may moderately decrease the risk of unsuccessful contract performance).

- <u>Slight Strength</u> – An aspect of an Offeror's proposal that has merit or exceeds specified performance or capability requirements in a way that will be slightly advantageous to the Government during contract performance (and/or may slightly decrease the risk of unsuccessful contract performance).

- <u>Slight Weakness</u> – A flaw in the proposal that slightly increases the risk of unsuccessful contract performance.

- <u>Moderate Weakness</u> – A flaw in the proposal that moderately increases the risk of unsuccessful contract performance.

- <u>Significant Weakness</u> – A flaw in the proposal that appreciably increases the risk of unsuccessful contract performance.

- <u>Deficiency</u> – A material failure of a proposal to meet a Government requirement or a combination of significant weaknesses in a proposal that increases the risk of unsuccessful contract performance to an unacceptable level.

*Id.* at 67-68.

34.    For Subfactor 2.6 (Small Business Participation Plan), the RFP provided a different rating table, which used the same adjectival rating labels but with descriptions tailored to the RFP small business objectives:

- <u>Outstanding</u> – Proposal indicates an exceptional approach and understanding of the small business objectives.

- <u>Good</u> – Proposal indicates a thorough approach and understanding of the requirements and contains at least one strength, and risk of unsuccessful performance is low to moderate.

- <u>Acceptable</u> – Proposal meets requirements and indicates an adequate approach and understanding of the small business objectives.

- <u>Marginal</u> – Proposal has not demonstrated an adequate approach and understanding of the small business objectives.

- <u>Unacceptable</u> – Proposal does not meet small business objectives.

*Id.*

35.     Under Factor 3, Past Performance, the evaluation was to "assess[] the Government's confidence in the ability of the offeror and the offeror's team members (e.g., significant subcontractors) to perform this effort and fully satisfy the technical, management, and other contractual requirements based on their record of past performance." *Id.* at 70.  To enable that evaluation, Offerors were to identify up to five recent and relevant contracts for work "similar in scope and complexity to the effort described in the SEQUOIA PWS." *Id.* at 58. Other than work performed by the prime offeror, offerors were only permitted to submit past performance for "significant" subcontractors, defined as a subcontractor "performing at least 25% of the total price of all awarded work, including options." *Id.*  Offerors were also required to submit sufficient information about the quality of their past performance, including any customer responses to Past Performance Questionnaires ("PPQs").  *Id.*

36.     Initially, NGA was to evaluate whether offeror past performance references were recent—meaning completed with the last three years, or ongoing for at least six months.  If an offeror's references met the minimum recency criteria, NGA would then assess the references for: (1) degree of relevancy; and (2) confidence.  *Id*. at 70-71.  The RFP contained defined adjectival ratings for both assessments.  *Id.*  Those ratings were as follows:

- <u>Substantial Confidence</u> – Based on the offeror's recent/relevant performance record, the Government has a high expectation that the offeror will successfully perform the required effort.

- <u>Satisfactory Confidence</u> – Based on the offeror's recent/relevant performance record, the Government has a reasonable expectation that the offeror will successfully perform the required effort.

- <u>Neutral Confidence</u> – No recent/relevant performance record is available or the offeror's performance record is so sparse that no meaningful confidence assessment rating can be reasonably assigned. The offeror may not be evaluated favorably or unfavorably on the factor of past performance.

- <u>Limited Confidence</u> – Based on the offeror's recent/relevant performance record, the Government has a low expectation that the offeror will successfully perform the required effort.

- <u>No Confidence</u> – Based on the offeror's recent/relevant performance record, the Government has no expectation that the offeror will be able to successfully perform the required effort

*Id.* at 71.

37.     The overall confidence rating assigned to an offeror's past performance was to reflect NGA's subjective evaluation of the information contained in the offeror's proposal, past performance evaluation input provided through customer PPQs, and other references, if any, that NGA might obtain containing additional information about the offeror's past performance (*e.g.*, from CPARS, FAPIIS, or interviews).  *Id.*

38.     For the Price factor, the RFP provided that proposed prices would be assessed to determine reasonableness of offerors' prices per label, prices per software license, and overall price.  *Id.* at 75.  The RFP authorized NGA to conduct a price realism analysis "to assess the risk of performance due to unrealistically low prices" and cautioned that "[i]f conducted, any price quote determined to be unrealistic will not be considered for award."  *Id.*

██████████████████████████████

39.     ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

13

████████████████████████████████████████

████████████████████████████████████████



40.

41.

42.

43.

44.

45.

46.

██████████████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

██████████████

47.     █████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████

***Notice of Award to EI, Scale's Debriefings, and Protest Activity***

48.     On September 25, 2025, NGA notified Scale that it awarded the Sequoia contract

to EI, and identified the following evaluation ratings:



| FACTORS/SUB-FACTORS | OFFEROR: Scale AI | OFFEROR: Enabled Intelligence, Inc. |
|---|---|---|
| Factor 1: Technical Demonstration | | OUTSTANDING |
| Sub-Factor 1.1 Quality Control | | OUTSTANDING |
| Sub-Factor 1.2 Label Creation | | GOOD |
| Sub-Factor 1.3 Labeling Platform | | OUTSTANDING |
| Factor 2: Technical/Management Approach | | OUTSTANDING |
| Sub-Factor 2.1 Performance Metrics | | OUTSTANDING |
| Sub-Factor 2.2 Labeling Guidance | | OUTSTANDING |
| Sub-Factor 2.3 Betterments | | GOOD |
| Sub-Factor 2.4 Labeling Workforce Structure | | GOOD |
| Sub-Factor 2.5 Classified Network Access | | GOOD |
| Sub-Factor 2.6 Small Business Participation Plan | | OUTSTANDING |
| Factor 3: Past Performance | | SUBSTANTIAL CONFIDENCE |
| Factor 4: Security | | PASS |
| Factor 5: Intellectual Property | | LOW RISK |
| Factor 6: Price – Sample Task Order TEP | | $275,796,310.48 |

Ex. 11, Award Notice at 2.

49.     The September 25, 2025 award notice acknowledged that Scale was "entitled to a

postaward debriefing" as per FAR 15.506(a)(1) and DFARS 215.506.  *Id.* at 2.  Scale timely

requested a debriefing from NGA later that same day.  *See* Ex. 12, Scale Debriefing Request at 4.

████████████████████████████████████████████

██████████████████████████████████████████

50.    On October 1, 2025, prior to Scale receiving its debriefing, Congress was unable to reach an agreement on funding and, as a result, the federal government shut down for 43 days, until November 13, 2025.





54.    ███████████████████████████████████████████████████████

███████████████████████████████████

55.    After a 43-day shutdown, the U.S. Government reopened on November 13, 2025.

56.    ███████████████████████████████████████████████

57.   On November 24, 2025, Scale timely submitted enhanced debriefing questions to NGA as part of the Department of Defense's Enhanced Debriefing Process.  Ex. 18, Scale Enhanced Debriefing Questions.

58.   NGA did not provide written responses to Scale's Enhanced Debriefing questions until December 19, 2025.  Ex. 19, NGA Enhanced Debriefing Responses.

59.   On December 29, 2025, Scale timely filed its bid protest at the Government Accountability Office ("GAO") triggering the Competition in Contracting Act's ("CICA") automatic suspension of contract performance because it was constructively filed within five days of the close of Scale's enhanced debriefing as per 4 C.F.R. § 21.0(d) (explaining that when fifth calendar day falls on day that GAO is closed, the filing deadline rolls over to the next day that GAO is opened).  Ex. 20, Scale GAO Protest.

60.   ███████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████

61.   ████████████████████████████████████████████
████████████████████████████████████████████████
██████████

62.   On January 16, 2026, NGA filed its override justification at GAO.  Ex. 22, Agency CICA Stay Override Decision.  NGA's justification states the override was necessitated

████████████████████████████████████████████
████████████████████████████████████████████

by the government shutdown that began on October 1, 2025. *Id.* at 1. At that time, NGA made an "initial determination that there was sufficient backlog from the incumbent contract that necessary support would be available through" October 30, 2025, such that there "would be little to no impact to continued operations if the lapse was resolved as expediently as prior lapses had been historically resolved." *Id.*

63. According to the justification, the shutdown's actual length—42 days, which NGA characterized as "an unprecedented duration"—"drastically altered NGA's internal considerations." *Id.* For that reason, on December 3, 2025—three weeks after the shutdown ended on November 12, 2025, and in the middle of NGA's debriefing of Scale—NGA issued Task Order 1 to EI "to allow for the on-boarding of the awardee and to begin accreditation processes of their software tools on NGA's network, which is a necessary step to begin performance of time-sensitive national security priorities." *Id.* And the override, in turn, was necessary to "continue to obtain data labeling services," without which "[NGA] and warfighters worldwide would necessary experience significant adverse consequences." *Id.* at 2-3.

## V.    CAUSES OF ACTION

### COUNT I

███████████████████████████████████████████████
████████████████████████████

64. Scale hereby incorporates the foregoing paragraphs as if fully set forth herein.

65. "[A] reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Banknote Corp. of America v. United States*, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004) (citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057-58 (Fed. Cir. 2000)). The Court has held that an agency acts

███████████████████████████████████████████
████████████████████████████████

irrationally when it evaluates in a manner that is inconsistent with the actual contents of an offeror's proposal. *Allicent Tech. LLC v. United States*, 166 Fed. Cl. 77, 114-16 (2023).

66.     The law is also clear that "[i]f an agency's evaluation of proposals differs significantly from the process disclosed in the solicitation, the agency's decision lacks a rational basis." *Lab. Corp. of Am. Holdings v. United States*, 116 Fed. Cl. 643, 650 (2014) (citing *360Training.com, Inc. v. United States*, 106 Fed. Cl. 177, 184 (2012)); *Samsara Inc. v. United States*, 169 Fed. Cl. 311, 319 ("An agency must evaluate proposals and make awards based on the criteria stated in the solicitation").

███████████████████████████████████████████████████████
████████████████████████████████████████████████████

67.     ███████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████

███████████████████████████████████████████████████████

68.     ████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████

69.     ██████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████



70.

71.

72. ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████

73. ████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████

74. ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████

75. ████████████████████████████████

████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

███████████████████████████████

████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████

76.     ███████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

77.     ███████████████████████████████████████████

██████████████████████████████████

           ████████████████████████████████
           ██████████████████████████████████████
           ██████████████████████████████████
           ████████████████████████████

██████████████████

78.     ███████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

79. ██████████████████████



80. ███████████████████████████████

81. ████████████████████████

82. ██████████████████████████

████████ :

83. ███████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

████████████████████

84. ██████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████

85. ██████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████

██████████████████████████████████

███████████████████████████████████



88. ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
█████████████████████████████████████████████
████████████████████████████████████████████████
███████████████

89. ████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
█████████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████

90. ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
█████████████████████████████



91. ██████████████████████████
██████████████████████████████████
████████████████████████████
██████████████████████████████████
████████████████████████

92. ████████████████████████
██████████████████████████████
██████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████
███████████████.



93. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████

94. ██████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████████

95. ██████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████

6 ██████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████████████████

30

████████████████████████████████
████████████████████████████████████

96. ███████████████████████████████████
███████████████████████████████████████
█████████████████████████████████████
████████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████
███████████████████████████████████████
█████████████████████████████████████
███████████████████████████████████████
██████████████████████

97. ███████████████████████████████████
████████████████████████████████████████
███████████████████████████████████████
█████████████████████████████████

98. ███████████████████████████████████
██████████████████████████████████████
███████████████████████████████████████
████████████████████████████████

99. ███████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████

███████████████████████████████
██████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████

100.    ████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

███████

████████████████████████████████████████████████████

██████████████████████████████

101.    ████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████

102.    ████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████

103.    ████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

104. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

105. ██████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████



106. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████



107.

108.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████

109.    ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████.

110.    ████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

111. ████████████████████████████████
████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
████████████████████

112. █████████████████████



113. ███████████████████████████████
█████████████████████████████████████
██████████████████████████████████████

████████████████████████████
███████████████████████████████



114.

115.

116.

117. ███████████████████████████████
████████████████████████████████████
███████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████████████████████████████████████
████████████████████████████

118. ████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
███████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
███████████████
████████████████████████████████████████
█████████████████████

119. ████████████████████████████████████████
████████

████████████████████████████
██████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
█████████████████████████████
██████████████████████████
███████████████████████████
██████████████████

████████████████████████████████
█████████████████████████████████



120.

121.

122.

███████████████████████████████████████████

████████████████████████████████████████

████████████

██████████████████████████████████████

123.    Under the remaining Factor 2 Subfactors, NGA evaluated the offerors as follows:

| Subfactor | Scale | EI |
|---|---|---|
| 2.2 Labeling Guidance | ██████ | OUTSTANDING |
| 2.3 Betterments | | GOOD |
| 2.4 Labeling Workforce Structure | | GOOD |
| 2.5 Classified Network Access | | GOOD |
| 2.6 Small Business | | OUTSTANDING |

█████████████

124.    ████████████████████████████████████

█████████████████████████████

████████████████████████████████████

███████████████

125.    ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

█████████████████████████████

126.    ████████████████████████████████████

███████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████

███████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████

127.    ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

128.    ████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

129. 

130.

131. ████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
███████████████████████████████████████

132. ████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████

133. ████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████

134. ████████████████████████████████
████████████████████████████████████████████
████████████████

████████████████████████████████████
████████████████████████████████████

135. ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
█████████████████████████████████████

136. ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████

137. ████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████
███████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
█████████████████████

138. ████████████████████████████████████████
████████████████████████████████████████
█████████████████████████████████████



139.

140.

141.

142.



143. ███████████████████████████

144. ███████████████████████████

145. ████████████████████████████████████

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████

146. ████████████████████████████████████

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

147. ████████████████████████████████████

████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████

████████████████████████████████████
████████████████████████████████████



148.

149.

150. ██████████████████████████████████

██████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████
███████████████████████████████████████████
██████████████████████████████████████████████
█████████████████████████████████████████
███████████████████████████████████████████████
█████████████████████████████████████████████
██████████████████████████████████████████████
███████████████████████████████████████████
█████████████████████████████████████████████
███████████████

151. ███████████████████████████████████

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
█████████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████

152. ██████████████████████████████████████

█████████████

   ██ ████████████████████████████
   ██ ██████████████████████████████████

49

**PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH
REQUESTED U.S. COURT OF FEDERAL CLAIMS PROTECTIVE ORDER**



153.    ███████, publicly available news articles have disclosed that, even up to the time of ***contract award***, EI had only approximately 34 personnel ████████████████████

████████████████████████████████████████████████████

████████████████████████████████ *See* Ex. 26, Bloomberg Law Article at 1 ("The staff has more than quadrupled to 136 people since the company learned of the government award.").  Accordingly, EI's proposal could have featured, at best, an intent to rely on contingent hires to fill the Sequoia data labeler requirements.  *Id.* at 2 (EI "interviewed dozens of new potential workers in the hopes his small company might win the contract. The applicants were told they would be hired only if the company bagged it.").  These proposed contingent hires, even if presented as sufficient to staff the contract, would not have security credentials or access to NGA networks, which presents a serious risk that should have been evaluated as at least a Moderate Weakness.  ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████.

50

154. ██████████████████████████████████

██████████████████████████████████████
████████████████████████████████████████
█████████████████████████████████████
██████████████████████████████████████

155. ██████████████████████████████████

██████████████████████████████████████
███████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
███████████████████████████████████
█████████████████████████████████

156. ██████████████████████████████████

██████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
█████████████████████████████████████
█████████████████████████  ████████████████
███████████████████████████████████
██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████

157.    ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

███████████████████████████████████████

████████████████████

158.    ████████████████████████████

███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

███████████████████████████████████

Given EI's lack of prior work with NGA, EI could not have even begun this work, presenting a serious risk to contract performance that could not reasonably have been evaluated as less than "moderate"—limiting a reasonable evaluation of EI's proposal under Subfactor 2.5 to only "Acceptable."

████████████████████████████████████████
███████████████████████████████████

159.    █████████████████████████████

██████████████████████████████████

████████████████████████████████████████

█████████████████████████████
████████████████████████████



██████████████████████████████████████████

██████████████████████████████████

**COUNT II**

**NGA'S ASSIGNMENT OF A "SUBSTANTIAL CONFIDENCE" RATING TO SCALE'S PROPOSAL UNDER EVALUATION FACTOR 3 – PAST PERFORMANCE WAS ARBITRARY AND CAPRICIOUS**

163.    Scale hereby incorporates the foregoing paragraphs as if fully set forth herein.

164.    It is a fundamental tenet of procurement law that proposals must be evaluated reasonably and in accordance with the terms of the solicitation.  *See Banknote Corp. of Am.*, 56 Fed. Cl. at 386; *Ashbritt, Inc. v. United States*, 87 Fed. Cl. 344, 374 (2009); *Red River Holdings, LLC v. United States*, 87 Fed. Cl. 768, 786 (2009); *see also* FAR 15.305(a) ("An agency shall evaluate competitive proposals and then assess their relative qualities solely on the factors and subfactors specified in the solicitation.").

165.    An agency acts contrary to law where the record reflects its evaluation of past performance is fundamentally unreasonable and/or contrary to the RFP's Past Performance evaluation criteria.  *See KGJJ Eng'g Solus., LLC v. United States*, 161 Fed. Cl. 556, 567-69 (2022) (finding agency error where evaluation of awardee past performance was contrary to solicitation criteria); *AM Gen., LLC v. United States*, 115 Fed. Cl. 653, 672-74 (2014) (same).

166.    NGA's Past Performance evaluation was also substantively unreasonable.  Under no circumstance could a reasonable past performance evaluation could have resulted in Scale and EI receiving equivalent "Substantial Confidence" past performance ratings where EI has no relevant past performance to speak of.  NGA's evaluation is fundamentally flawed and inconsistent with the offerors' proposals.  *See* Ex. 17, SSDD at 8.

167.    Under the Past Performance Factor, the RFP required offerors to "provide past performance references for up to five contracts/task orders for recent work similar in scope and

██████████████████████████████████████

████████████████████████████████████

complexity to the effort described in the SEQUOIA PWS." Ex. 2, RFP at 58.  As relevant, the RFP anticipated a ***seven-year, $708 million*** effort, with a first-year labeling volume of approximately 4.8 million annotations (unclassified and Secret networks only), increasing to approximately 8 million annual annotations in year two and 10 million annual annotations by year seven (unclassified, Secret, and Top Secret networks).  *See* Ex. 27, RFP Labeling Volume.

168.    The evaluation of Factor 3, Past Performance, was to assess "the Government's confidence in the ability of the offeror and the offeror's team members (e.g., significant subcontractors) to perform this effort and fully satisfy the technical, management, and other contractual requirements" and "the offeror's probability of meeting the solicitation requirements." Ex. 2, RFP at 70.

169.    ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████

170.    ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████

████████████████████████████████████████
████████████████████████████████████████████

171.    ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

172.    ████████, it is simply not credible that EI could have reasonably obtained ████ ████ "Substantial Confidence" rating where publicly available government contract databases show that EI has previously performed only **two** prime contracts valued at **_less than $1 million_** in total, **_in the company's entire history_**.[12]  *See* Ex. 30, USA Spending Report, at 1; Ex. 31, HigherGov Report at 2.  Based on EI's contracting history, any past performance reference submitted by EI itself should have been evaluated as "Not Relevant."  A past performance history of just two small prime contracts (one amounting to a total of just $74,900) have "little or none of the scope and magnitude of effort and complexities this solicitation requires."  *See* Ex. 2, RFP at 71 (defining "Not Relevant").

173.    Furthermore, even if EI proposed a team including "significant subcontractors" with relevant past performance, that should not have enabled EI to obtain a "Substantial Confidence" or even a "Satisfactory Confidence" past performance rating overall.  With respect to "significant subcontractors," the RFP required the offeror to "clearly explain what role the . . . significant subcontractor will assume in performance of the contract and demonstrate that the resources of the subsidiary or affiliate will affect the performance of the Offeror in performance of the SEQUOIA contract."  Ex. 2, RFP at 58.  And the evaluation was to consider "the context

---

[12]    USAspending.gov shows that EI has received Contract No. FA864923P0478 valued at $766,610 and Contract No. FA864923P0293 valued at $74,895.  Even including a variety of small subcontracts, EI's total historical government-related business amounts to just $3 million.

████████████████████████████████████

████████████████████████████████

of the data" and "confidence in the ability of the offeror and the offeror's team members (e.g., significant subcontractors) to perform this effort and fully satisfy the technical, ***management***, and other contractual requirements." *Id.* at 70 (emphasis supplied).

174.    Notwithstanding EI's potential teaming arrangements, EI as the prime contractor is responsible for the management of the contract effort.  Given that EI's largest prime contractor experience totaled just ***one-tenth of one percent*** the size of the anticipated Sequoia requirements, EI has no experience whatsoever with managing a contract effort of the scope, magnitude, and complexity of Sequoia.  NGA's conclusion that there was a "high expectation" that EI will successfully perform the Sequoia contract, in that context, is unreasonable.  If EI had been reasonably evaluated under the Past Performance Factor, Scale should have had a significant, if not overwhelming, advantage under Factor 3.

175.    Had NGA reasonably evaluated EI's total lack of experience with requirements similar in size, scope, and magnitude to the Sequoia effort, ███████████████████ ████████████████████████.  It appears that NGA essentially treated a lack of relevant past performance as a substitute for positive relevant past performance, which is prohibited.  Even to the extent EI partnered with a more experienced company as a "significant subcontractor," it is unreasonable on its face for NGA to assign the highest-possible past performance confidence rating to a proposed prime contractor that has never managed a government contract valued over $1 million, in the context of the $708 million Sequoia program.

176.    But for NGA's errors, there is a substantial chance that Scale would have been selected for the award.

## COUNT III

## NGA IGNORED A DISQUALIFYING PERSONAL CONFLICT OF INTEREST AND UNFAIR COMPETITIVE ADVANTAGE THAT SHOULD HAVE ELIMINATED EI FROM CONSIDERATION FOR AWARD

177.    Scale hereby incorporates the foregoing paragraphs as if fully set forth herein.

178.    NGA unreasonably failed to recognize and consider a disqualifying personal conflict and unfair competitive advantage resulting from EI's reliance on former NGA Director, Dr. Cindy Daniell, who currently serves as an EI Advisory Board Member.  *See* Ex. 32, Daniell LinkedIn at 1.  At a minimum, Dr. Daniell's involvement with EI creates an appearance of impropriety and undermines NGA's award decision.  NGA's failure to consider the conflict and unfair advantage is all the more unreasonable, as the RFP expressly required offerors to disclose all actual or potential conflicts or face mandatory disqualification from the procurement.

179.    The FAR instructs that "[t]ransactions relating to the expenditure of public funds require the highest degree of public trust and an impeccable standard of conduct."  FAR 3.101-1.

180.    The general rule is to avoid strictly any conflict of interest or even the appearance of a conflict of interest in Government-contractor relationships."  FAR 3.101-1.  Additionally, the FAR requires that contracting officials avoid, neutralize, or mitigate potential significant conflicts of interest so as to prevent an unfair competitive advantage or the existence of conflicting roles that might impair a contractor's objectivity. FAR 9.504(a); 9.505.  Under the FAR's conflict rules, "an unfair competitive advantage exists where a contractor competing for award of any Federal contract possesses—(1) Proprietary information that was obtained from a Government official without proper authorization; or (2) Source selection information (as defined in 2.101) that is relevant to the contract but is not available to all competitors, and such information would assist that contractor in obtaining the contract."  FAR 9.505(b)(1)-(2).

181.    To aid in detecting OCIs, Section L.26.3.2 of the RFP required offerors to submit detailed information regarding potential conflicts, which NGA was required to use in "assess[ing] compliance with the OCI clause and provisions."  *See* Ex. 33, RFP Amendment 0003 at 11. Specifically, the RFP required offerors to complete the HM0476.52.209-9Z03 SEQUOIA AI/ML OCI clause in Section H of the RFP and submit an OCI Disclosure and Analysis form (Attachment J.5 of the RFP).[13]  *See id.*; Ex. 34, RFP Attach. J.5, OCI Disclosure and Analysis Form.  And for instances where the prime offeror or proposed subcontractors were performing any work as an NGA or Maven (including non-NGA efforts) contractor (either as a prime or subcontractor), the offeror was required to "provide all relevant information concerning work performed on the current effort and any financial interests and describe the effort expected to be performed under this effort (to include that of its teammates, consultants, subcontractors) that may create an OCI or potential OCI as a result of bidding on or winning this effort."  Ex. 33, RFP Amendment 0003 at 11.  The RFP cautioned that "Offerors who do not disclose potential or actual conflicts, or do not provide mitigation plans and certification for those conflicts, ***will be considered non-compliant and will be disqualified*** from award pursuant to FAR 9.504."  *Id.* at 11 (emphasis supplied).

182.    Consistent with the FAR's emphasis on upholding the integrity of the procurement process, the Court has held that even the mere appearance of impropriety or conflict of interest is enough to taint an award decision and require further investigation.  *See Raytheon Co. v. United States*, 170 Fed. Cl. 561, 581 (2024) ("*Apparent* impropriety comprises scenarios

---

[13]    Among other things, clause M0476.52.209-9Z03 provides that "[t]he SEQUOIA requirement has special, non-mitigatable Organizational Conflict of Interest (OCI) restrictions. SEQUOIA's scope of work requires creation of labeled datasets in support of NGA AI/ML algorithm and model development."  Ex. 2, RFP at 9.

in which there are at least some facts suggesting the need for further investigation and a determination of whether there is an actual violation or where the facts indicate that a conflict may arise in the future."). And "the *appearance* of impropriety (or conflict of interest), by definition, means that an objective observer might believe there is an impropriety, even where the facts, when fully investigated, would not support a finding of an actual legal violation or impropriety in the procurement." *Id.* Even in the latter case, "the government may eliminate an offeror from a procurement based on the mere appearance of impropriety. The government is not required to find that an alleged impropriety had an actual (or even likely) impact on the procurement, or even that the outcome of the procurement suggests that it was tainted or unfair." *Id.* at 565; *see also NKF Eng'g, Inc. v. U.S.*, 805 F.2d 372 (Fed. Cir. 1986) (overturning lower court's holding that appearance of impropriety, alone, is not a sufficient basis to disqualify an offeror, and finding agency reasonably decided to disqualify offeror based on the appearance of impropriety where the offeror had hired a former government employee with knowledge of contractor proprietary information and source selection sensitive information).

183.    Publicly available information demonstrates that Dr. Daniell became the Director of the Research Directorate for NGA in June 2018. *See* Ex 32, Daniell LinkedIn at 1; Ex. 35, Daniell Bio at 1. Dr. Daniell served in that position through at least June 2023. *Id.* Dr. Daniell's work at NGA included leading "much of NGA's artificial intelligence work." *See* Ex. 36, June 11, 2019 C4ISR Net Article. As part of this work and consistent with her role as Director of Research Directorate at NGA, Dr. Daniell would have had direct insight into non-public, competitively useful information regarding Scale's performance of Project Maven. That contract, which is the incumbent effort for the current procurement, was managed by NGA and

was performed from September 29, 2020 through July 29, 2024—directly overlapping with Dr. Daniell's time at NGA and her leading role in NGA's artificial intelligence programs.

184.    Additionally, as someone leading NGA's artificial intelligence work, Dr. Daniell necessarily was involved with the requirements underpinning the Sequoia solicitation.  For example, as early as June 2019, Dr. Daniell was working to shape NGA's utilization of artificial intelligence projects.  *See* Ex. 36, June 11, 2019 C4ISR Net Article at 2-4.

185.    Perhaps because of her senior role at NGA, Dr. Daniell joined EI as an Advisory Board Member in January 2024, less than a year after leaving government employment where she likely had direct insight into non-public Scale information.  *See* Ex. 32, Daniell LinkedIn at 1; Ex. 37, EI and Daniell Hiring Announcement.  Directly evidencing EI's intention to utilize Dr. Daniell's non-public and competitively useful knowledge for an advantage on the SEQUOIA effort, Dr. Daniell posted that the EI "opportunity allows [her] to help align the company's innovative efforts with key industry and ***government priorities***."  *Id.* (emphasis supplied).

186.    Thus, Dr. Daniell's prior work at NGA and current role at EI pose serious OCI and unfair competitive advantage concerns which NGA failed to recognize and investigate. Indeed, in awarding the contract to EI, NGA appears to have ignored the issue altogether. Despite the highly detailed OCI compliance clause in the RFP and the requirement to submit an OCI Disclosure and Analysis form, there is no indication that NGA conducted any OCI compliance assessment as required by RFP Section L.26.3.3.  *See* Ex. 33, RFP Amendment 0003 at 11.  Nothing in the information produced by NGA indicates that NGA performed any OCI or unfair competitive advantage evaluation or even considered the conflict and resulting advantage from Dr. Daniell's role at EI.

187.    NGA's failure to investigate the conflict and conduct an OCI investigation prejudiced Scale by forcing it to compete on an unequal basis.  *See Jacobs Tech. Inc. v. United States*, 100 Fed. Cl. 198, 213 (2011) ("Until the agency conducts additional OCI analysis, [protester] is not assured that it is competing on a level playing field.  An OCI by its nature inflicts a non-trivial competitive injury on the other offerors."); *NetStar-1 Gov't Consulting, Inc. v. United States*, 101 Fed. Cl. 511, 529 (2011) ("A long line of cases holds that when a potential significant OCI is identified, prejudice stemming from that OCI is presumed, unless the evidence shows compelling evidence to the contrary").

188.    NGA's failure to recognize and investigate the improprieties resulting from EI's involvement with Dr. Daniell similarly resulted in the appearance of an unfair competitive advantage for EI, because Dr. Daniell's role and timeline at NGA provided ample opportunity for her to access non-public, competitively sensitive information regarding by Scale and the SEQUOIA procurement.  *See* FAR 9.505(b)(2); *see also CACI Inc.-Fed.*, B-421224, Jan. 23, 2023, 2023, 2023 CPD ¶ 35 (where former agency employee was a consultant for offeror, CO reasonably determined that former employee's activities "created at a minimum, an appearance of an unfair competitive advantage" where employee had access to non-public information).

189.    Accordingly, at a minimum, GAO should find NGA's failure to adequately investigate potential conflicts and unfair competitive advantages resulting from EI's hiring of Dr. Daniell as unreasonable and recommend that NGA conduct a proper investigation of EI's conflicts and unfair competitive advantages in accordance with the RFP and procurement law.[14]

---

[14]    To the extent EI failed to disclose the conflict, that too competitively prejudiced Scale, as the RFP required elimination in instances where an offeror failed to disclose actual or potential conflicts.  *See* Ex. 33, RFP Amendment 0003 at 11 "Offerors who do not disclose potential or actual conflicts, or do not provide mitigation plans and certification for those conflicts, ***will be***

190.    But for NGA's errors, there is a substantial chance that Scale would have been selected for the award.

**COUNT IV**

**NGA FAILED TO REASONABLY PERFORM A REALISM ANALYSIS ON EI'S PROPOSED PRICE**

191.    Scale hereby incorporates the foregoing paragraphs as if fully set forth herein.

192.    NGA's failure to rationally evaluate and consider EI's unrealistically low price renders the price evaluation arbitrary and capricious.  Had NGA performed a rational evaluation, EI would be ineligible for award.

193.    A price realism analysis examines whether an offeror's prices are unrealistically low for the work to be performed.  To this end, a price realism analysis is performed to ensure that an offeror's proposed prices are not so low that contract performance is put at risk or that the price evidences an offeror's lack of understanding of the solicitation's requirements.

194.    For price proposals, the RFP required offerors to provide "sufficient factual information describing the Offeror's proposed price for meeting solicitation requirements . . . ." Ex. 2, RFP at 62.

195.    Building on this language, the RFP contemplated a price realism analysis and stated that "[p]rice realism analysis may be applied in order to assess the risk of performance due to unrealistically low prices."  *Id.* at 75.  The RFP further stated that "[i]f conducted, any price quote determined to be unrealistic will not be considered for award."  *Id.*

196.    As the Court has previously held, "[a]lthough the FAR does not require an agency to conduct a price realism analysis in procurements for fixed-price contracts, an agency may

_____

***considered non-compliant and will be disqualified*** from award pursuant to FAR 9.504." (emphasis supplied).

nonetheless obligate itself to perform one by the terms of its solicitation." *DigiFlight, Inc. v. United States*, 165 Fed. Cl. 588, 598 (2023). For example, in *FCN, Inc. v. United States*, 115 Fed. Cl. 335, 376 (2014), the Court explained that "[b]ecause a price realism analysis was contemplated by the Solicitation, one had to be conducted, as the Solicitation stated that unrealistically low offers 'may be considered unacceptable and rejected on that basis.'"

197.    The Court in *ViON Corp. v. United States*, 122 Fed. Cl. 559, 573 (2015), reached a similar conclusion, holding that a solicitation stating that "[t]he Government may reject any proposal that is . . . unreasonably high or low in price when compared to Government estimates" was enough to "commit[] the agency to conducting a price realism analysis." *Id.* at 573.

198.    Here, the RFP expressly contemplated a price realism analysis and stated that "[a]ny price quote determined to be unrealistic will not be considered for award." Ex. 2, RFP at 75. This language, along with the RFP-mandated obligation to provide "sufficient factual information describing the Offeror's proposed price for meeting solicitation requirements," committed NGA to performing a price realism evaluation. *See id.*; *see also DigiFlight*, 165 Fed. Cl. at 598; *FCN*, 115 Fed. Cl. at 376; *ViON*, 122 Fed. Cl. at 573.

199.    Despite this, there is no evidence that NGA performed the required price realism analysis. The Award Notice and debriefing materials indicates that NGA purportedly accepted EI's proposed price of $708.3 million and $275,796,310.48 for the Sample Task Order as realistic. Ex. 11, Award Notice at 1-2; Ex. 17, SSDD at 9.

200.    To the extent NGA performed the required realism analysis and concluded that EI's proposed price of $708.3 million and $275,796,310.48 for the Sample Task Order was realistic, NGA's analysis was irrational. A proposed price of $275,796,310.48 (███████████ ██████████████████████████) for the Sample Task Order is unrealistically low and

demonstrates that EI's approach does not address RFP requirements and will lead to performance risk. NGA must know this. With respect to the costs of cloud services supporting the data labeling effort NGA amended the RFP so that the contractor bears these costs (initially, the RFP contemplated that cloud costs would be billed back to NGA). *See* Ex. 38, RFP Amendment 0001 at 2. NGA has knowledge of the historic costs of the cloud services supporting this work ██

██████  EI does not, and NGA should have recognized that EI cannot reasonably absorb those costs at its proposed price. Based on the RFP requirements, there is simply no way that an offeror can meet all Solicitation requirements at a price of just $275,796,310.48. At a minimum, NGA should have conducted a price realism analysis to ensure that there was not a risk to EI's ability to perform the contract.

201.    Additionally, if NGA entirely failed to perform a price realism analysis, the price evaluation and resulting award decision are irrational as a matter of law because the RFP and decisions of the Court required NGA to evaluate price realism. *See* Ex. 2, RFP at 75; *DigiFlight*, 165 Fed. Cl. at 598; *FCN*, 115 Fed. Cl. at 376; *ViON*, 122 Fed. Cl. at 573.

202.    The irrationality of NGA's acceptance of EI's unrealistically low prices is further underscored by the fact that NGA considered prices per user and "historical pricing" when issuing IFDs as part of the discussions process. *See* Ex. 5, IFD Attachment at 19-20. NGA therefore was aware of the historical pricing required for successful performance of the work yet failed to consider whether EI's unrealistically low prices allowed it to perform that work.

203.    NGA's flawed evaluation prejudiced Scale. Had NGA performed a rational price realism evaluation as required by the RFP and the law of this Court, NGA would have found EI's price unrealistic, requiring NGA to deem EI ineligible for award.

████████████████████████████████

██████████████████████████████

## COUNT V

## THE SOURCE SELECTION DECISION WAS ARBITRARY AND CAPRICIOUS BECAUSE IT WAS INFECTED BY ALL OF THE EVALUATION ERRORS IDENTIFIED ABOVE

204.    Scale hereby incorporates the foregoing paragraphs as if fully set forth herein.

205.    The numerous flaws in NGA's evaluation discussed above competitively prejudiced Scale and resulted in an arbitrary and capricious source selection decision.

206.    At the outset, EI should not have been considered in any source selection decision.  Absent NGA's irrational disregard of EI's OCI and unfair competitive advantage, EI would have been ineligible for award.  Similarly, had NGA conducted a rational price realism evaluation, NGA would have found EI unawardable based on its unrealistically low pricing.

207.    In addition to these threshold issues demonstrating EI's ineligibility for award, Scale identified myriad errors in NGA's evaluation that culminated in a flawed source selection determination.  Because a source selection decision based on a flawed evaluation of proposals is unreasonable, NGA's award to EI should be set aside on this basis as well.  *See, e.g.*, *Femme Comp Inc. v. United States*, 83 Fed. Cl. 704, 767 (2008) (holding that best value decision based upon "irrational evaluations" was improper); *see also Laboratory Corp. of America Holdings v. United States*, 116 Fed. Cl. 643, 654 (2014) (finding protester prejudiced by multiple evaluation errors, which "neutralized [protester's] technical advantage, eliminated the need for a best value trade-off analysis, conducted an 'apples to oranges' price comparison, and failed to recognize [the awardee's] significant miscalculations").

208.    NGA's evaluation errors and failure to exclude EI from the procurement competitively prejudiced Scale.

209.    But for the numerous errors detailed above and NGA's unreasonably failure to disqualify EI based on its OCI, unfair competitive advantage, and unrealistically low price, Scale would have had a substantial chance at award, which is all that is required to demonstrate prejudice. *See WaveLink, Inc. v. United States*, 154 Fed. Cl. 245, 281-82 (2021) ("'[A]ll a protester must establish to demonstrate prejudice is that it has a substantial chance of receiving the contract—that it is a qualified bidder and could compete for the contract.'" (quoting *Tinton Falls Lodging Realty, LLC v. United States*, 800 F.3d 1353, 1360 (Fed. Cir. 2015))).

210.    Had NGA conducted the procurement in accordance with the RFP and relevant procurement law, the justification for award to EI would not exist and Scale would receive the award. An award decision "riddled with mistakes" cannot stand. *BayFirst Solutions, LLC v. United States*, 102 Fed. Cl. 677, 94 n. 22 (2012).

## VI.    BASIS FOR INJUNCTIVE RELIEF

211.    Scale hereby incorporates the foregoing paragraphs as if fully set forth herein.

212.    As discussed above, NGA misevaluated the offerors proposals under Factor 2 – Technical/Management Approach and Factor 3 – Past Performance, failed to reasonably investigate a disqualifying personal conflict and unfair competitive advantage, failed to reasonably conduct a price realism evaluation, and conducted an arbitrary and capricious best value tradeoff decision. Accordingly, Scale will succeed on the merits of its allegations. Injunctive relief is therefore appropriate where (1) Scale will suffer irreparable harm in the absence of such relief; (2) the balance of harms weighs in favor of an injunction; and (3) an injunction is otherwise in the public interest. *PGBA, LLC v. United States*, 389 F.3d 1219, 1223 (Fed. Cir. 2004).

213.    Absent an injunction, Scale will be irreparably harmed by NGA's award decision. As this Court has consistently instructed, "a protester suffers irreparable harm if it is deprived of the opportunity to compete fairly for a contract" as the result of an arbitrary and capricious procurement process. *Palantir USG, Inc. v. United States,* 129 Fed. Cl. 218, 291 (2016), *aff'd,* 904 F.3d 980 (Fed. Cir. 2018) (collecting cases). Here, Scale was denied the opportunity to compete fairly because of NGA's erroneous evaluation of Scale's and EI's proposals.

214.    The balance of the harms also favors Scale. NGA will not be harmed by such an injunction; as the incumbent contractor, Scale has been and can continue to provide the services required under the new contract. Absent injunctive relief, Scale will be deprived of a fair opportunity to compete and to continue gaining valuable experience working with NGA. By contrast, NGA will still be permitted to obtain the required services through a fair procurement process, and any minimal harm it may suffer from delay is the consequence of its own arbitrary, capricious, and unlawful actions and are overcome by its own long-term interest in ensuring that the awarded contract represents the best overall value to the government. *See, e.g.*, *ANHAM FZCO v. United States,* 144 Fed. Cl. 697, 724 (2019).

215.    The public interest favors an injunction. The "public interest always favors the correct application of law, and more particularly, in the context of procurement statutes, the public interest always favors open and fair competition, and to that end, agency compliance with applicable regulations." *Seventh Dimension, LLC v. United States,* 160 Fed. Cl. 1, 35 (2022) (cleaned up). As discussed above, Scale is an experienced NGA contractor with stellar past performance on the incumbent contract, and the public interest self-evidently favors an open and fair competition that may result in Scale receiving the contract at issue. Because federal procurement law was intended to promote competition, "[t]he public interest in honest, open, and

fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid." *CW Gov't Travel, Inc. v. United States,* 110 Fed. Cl. 462, 496 (2013).

## VII.   PRAYER FOR RELIEF

For each and all of the foregoing reasons, Scale requests that the Court enter judgment in its favor and provide the following relief:

1. Enjoin the award of the IDIQ contract to EI;

2. Direct NGA to open discussions and allow Scale to submit a revised proposal to address any alleged deficiencies or significant weaknesses NGA assessed, and to reevaluate Scale's proposal in accordance with the RFP's stated evaluation criteria; and

3. Grant any other such relief as the Court may deem just and appropriate.


January 27, 2026                              Respectfully submitted,

                                             /s/ Anuj Vohra
                                             Anuj Vohra
                                                 (Counsel of Record)

                                             Zachary H. Schroeder
                                             Issac D. Schabes
                                                 (Of Counsel)

                                             CROWELL & MORING LLP
                                             1001 Pennsylvania Avenue, NW
                                             Washington, DC 20004-2595
                                             Tel: (202) 624-2502
                                             Fax: (202) 628-5116
                                             AVohra@crowell.com

                                             *Counsel for Scale AI, Inc.*